A. G. Curtin, Constans Curtin, E. C. Humes, M. H. Wil-
    son and J. D. Shugert, doing business as bankers,
    under the name of " The Centre County Banking
    Company," *v.* J. P. Gephart, Indorser.

*Promissory notes—Action against indorser—Defenses.*

In an action against an indorser on promissory notes the defendant
produced testimony tending to show that the notes in suit had been in-
dorsed and given as collateral security for certain drafts which had been
paid, the plaintiffs' testimony tended to show that the notes were given
for advances actually made.   The court submitted the evidence to the
jury, and a verdict was rendered in favor of the defendant.   *Held*, that
a judgment on the verdict should be sustained.

*Practice, C. P.—Charge of court.*

A party cannot complain of a trial judge's omission to draw certain in-

ferences from the evidence, where the party himself has neglected to embody his view of the inferences deducible from the evidence in a request for instructions, and to submit the same to the court.

Argued April 21, 1896. Appeal, No. 21, Jan. T., 1896, by plaintiffs, from judgment of C. P. Centre Co., Nov. T., 1893, No. 258, on verdict for defendant. Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Assumpsit upon promissory notes. Before ARCHBALD, P. J., of the 45th judicial district, specially presiding.

The facts appear by the charge of the court which was as follows :

This action is brought by several parties composing the Centre County Banking Company, against J. P. Gephart, as indorser, on a note of the Bellefonte Iron & Nail Company, which was drawn for $6,200, payable in one month, dated November 6, 1891, and indorsed by Mr. Gephart. This note is now produced here in the hands of the plaintiffs, the bank, and if there were nothing more in the case, this mere circumstance would entitle the plaintiffs to a verdict at your hands for the full amount of the note, with interest from the time it became due. The evidence, however, shows that this note is simply the last renewal of quite a number of notes, the first being given sometime in April, 1890, for $3,500. This was a short time note of ten days, I believe, and was renewed at the end of that period, and again renewed the 19th of June, of the same year. Another note of $2,700 additional was given on the latter date, so the bank at that time, June 19, 1890, held the two—one for $3,500 and the other for $2,700.

These again were renewed from time to time as they became due, and in April, 1891, the year subsequently, the time was extended on each of them, as I understand it, to thirty (30) days. Then they were continued in that form until in September they were consolidated and made one note for $6,200. On this there were two renewals, one the 1st of October, for thirty (30) days, and again, the one in suit, on the 6th of November, for the same amount. On each of these notes, beginning with the very first, Mr. Gephart, the defendant here, was an indorser for the accommodation of the Iron & Nail Company.

The contention on the part of Mr. Gephart is, that the note in suit, and as I understand it, each of these notes, to which I have referred, was given for a single and specific purpose, and that was to protect or collaterally secure, or as some of the witnesses have said, to put in bankable shape certain transactions between the bank and the Iron & Nail Company, with regard to advances on the accounts of customers of the latter, so that the bank might be properly secured.

These transactions, as I understand the explanation given about them, were about like this : The exact transaction with regard to what are spoken of as iron certificates, is not very clearly given by the testimony.  But with regard to the drafts spoken of, Mr. Munson says that as they shipped nails to different parties, their customers, he would draw or make drafts for the amount of the bills upon these customers.  Of course the bills were not immediately due, and as he said he had no right to draw on them and ask them to pay immediately, but for the purpose of securing advances from the bank he made these drafts upon his customers immediately, and then deposited the draft in the bank and secured advances upon these drafts, representing the actual transactions and actual sale of what the iron company was producing.  And then, subsequently, when the customers of the Iron & Nail Company paid their bills and remitted for their account, this would be turned over to the bank in payment for the drafts that had been left with the bank, but not forwarded.  [The contention on the part of the defendant is that this note, and the notes, as I have said, on which this was a renewal, were for the purpose of protecting these drafts, and as collateral security to them and to the iron certificates, which have been spoken of but not fully explained.] [1]

[Perhaps it would not be out of course to take the suggestion of counsel, made in your hearing, with regard to these iron certificates.  Because, as I understand it, they amounted to about the same thing as the transactions with the drafts ; that is, they were certificates of iron, in the hands of customers of the iron company representing in that way indebtedness of property of the iron company so certifying.  They are spoken of as iron certificates, whatever that may mean, and were deposited with the bank, and the bank made deposits upon them; and subsequently when the indebtedness or accounts or whatever it was

these iron certificates represented were paid, as Mr. Munson says, they were lifted. I understand by that, that the moneys advanced upon these certificates were paid or made good to the bank. Now, the claim on the part of the defendant here is that these notes were merely given as collateral security, that is as security to or collateral aside from the actual drafts, and the original certificates deposited and the money advanced upon them.

Some of the witnesses, as I have said, speak of this as putting the matter in bankable shape so that the bank would not have simply the representation of indebtedness, but would have apparently a note with the proper indorser upon it to whom they could look in case of the failure of the iron certificates to be made good.] [2]

The bank, however, in opposition to this, claims that the notes of which I have spoken were given for money actually advanced at that time.

This is not sustained by any positive testimony except that of Mr. Shugert. While Mr. Kurtz does indeed say that the first note of $3,500 was for the pay roll of the company, yet, this assertion, as I recall it, was shown to have been made, not upon any actual knowledge, but from information gathered from the books of the bank or from others. But we have a positive statement on the part of Mr. Shugert, cashier, who seems to have had more directly the transaction with Mr. Munson representing the iron company, that there were advances made both at the time the $3,500 note was made, and again when the $2,700 additional note was given. He says, specifically, that when these notes were given Mr. Munson was allowed to check against his account for that much more. That is to say, as I understand it, the account of the Iron & Nail Company with the bank was treated as being just so much more than that, so much more than it had been before the note was given, and the iron company was allowed to draw from their account just as though this had actually been credited, although it was not really credited upon their account at the time.

Mr. Shugert further says that in view of this which was really an advance of money (if that was the transaction), the account bore interest, and interest was charged upon the account from that time. He says that these notes were given at short time at the suggestion of Mr. Munson, so that they could be

taken up at the first opportunity in relief of Mr. Gephart, the indorser.

Mr. Munson, however, swears positively to a definite arrangement, that the notes in question were merely to be held as security for the money advanced, and this particular note, he says, was held and to be held as collateral security for five (5) drafts; one of Wilcox & Brother for $400, and another of Buckingham, Clark & Jackson for $2,000; and three (3) others on C. E. Pope & Company; two for $1,500 and one for $1,200. He must have been a little mistaken with regard to this because some of these drafts antedate the note, some of them being drawn on October 2, whereas the note bears date November 6. [But if we regard this note simply as a renewal of one which preceded it of a like amount dated 1st of October, or about that time, his statement can be reconciled with the other facts.] [3] The total of these drafts, you will see, amounted to $6,600. I do not understand it to be disputed that all the drafts which are thus spoken of by Mr. Munson were subsequently paid. He says with regard, for instance, to the Wilcox & Brother draft of $400, that remittance was received for that of $416 and some cents; also that the Buckingham, Clark & Jackson draft of $2,000 was paid, and that one of the Pope & Company drafts of $1,500 was forwarded to New Haven, Conn., and there lifted, which means, as I understand it, paid by the parties on whom it was drawn. He also produces the other two drafts of Pope & Company of $1,200 and $1,500, with receipts of payment upon them, and if that testimony be believed, and, as I understand, there is no testimony to contradict it, it would show a payment of all of the drafts for which Mr. Munson says the note in suit was simply held.

Now, it is for you to say what really was the contention between these parties. What is the truth here? Is it as contended for by the bank or as testified to by Mr. Munson? The plaintiffs argue that the defendant's claim that this was for a specific purpose as collateral security to these drafts, which have been paid, has been refuted by several circumstances; for instance, by the long series of renewals beginning away back in April, 1890, beginning at a less amount and continued along; also by the circumstances that after the two notes had sprung into existence they were both continued right along for

an unvarying amount, not shifting as the amount of the drafts may have shifted for the iron certificates, but carried along at $3,500 and $2,700, respectively, and finally combined into the amount of the two, $6,200; and also to sustain that position you have the positive testimony of Mr. Shugert that the iron company received at the time what was equivalent to a credit on account for the actual amount of the notes or for the proceeds of them. But on the other hand the defendant argues that his theory of the case is sustained by the fact that the notes were carried along without any actual discount, the bank simply holding them without more, and that they were never actually carried into the account until after the failure of the iron company in November, 1891, not being charged as a discount on the books of the bank or the pass book of the Iron & Nail Company, until the 21st of November, 1891. It is also argued for the plaintiffs that there is a discrepancy in the amount of the drafts and the amount of the note, the draft being $6,600, while the note is $6,200.

[I also noted a matter that has not been adverted to by counsel in the argument which came out in response to a question put by myself to Mr. Shugert. He says that " at the time the notes were drawn, they "—meaning the Iron & Nail Company —" had the advantage of them in their account, and we continued to recognize them as collateral to their account."

Again, in another place, a little further on, he says : " The notes were held as collateral for their payment."

I do not know exactly what is meant by this, but I just call it to your attention for this fact. This statement may have a possible bearing on the case as the notes are apparently recognized by Mr. Shugert, in his statement, as collateral to something. It is true he says they were collateral to the accounts, but still the notes, and this note which is the culmination of them all, by this statement, stand in the light of being collateral to something. That would rather repel the idea of a discount on the notes at the time or before an advance of money was made upon them.] [4]

Looking over all the testimony, gentlemen, and not simply that to which I have called your attention, if there are other points in the testimony that I have not referred to, for I do not mean to withdraw any of them from your consideration, what is

the truth here? How is the case determined in your minds? If this note, or those of which it is the renewal, was held as collateral merely by the bank, collateral to the drafts mentioned by Mr. Munson, and those drafts have been paid, of which there seems to be little doubt, the bank could not divert the note to another purpose and place it to the general account of the Iron & Nail Company. If there was an understanding between Mr. Munson and the officers of the bank with regard to these notes, and the note which is the final renewal of them all, such as I have explained, the bank could not violate that understanding. They could not change the condition on which they held it, and the indorser, Mr. Gephart, would have a right to enforce that condition.

The Iron & Nail Company would have a right to enforce that condition, and because of that right in the Iron & Nail Company Mr. Gephart would have the same. [But if, according to the testimony of Mr. Shugert, money was actually advanced upon the original notes of $3,500 and $2,700, then this note which stands in the place of those would be responsible for these advances, and the bank could hold the indorser upon it for the amount of these advances, which would be the consideration for the notes being given. The whole disposition of this case lies according as you find that fact. Was the note collateral to drafts which have been paid? If it was, then the note is no longer an obligation, it has served its purpose and the defendant is entitled to your verdict. Upon the other hand, if the notes were given and the money actually advanced upon them by the bank at the time, and advanced directly in consideration of the obligation of these notes to the bank, then they could insist now, at the end of the transaction, upon the amounts which they so advanced coming back to them through this suit out of this note. That is the question that you have to dispose of.] [5]

Verdict and judgment for defendant. Plaintiffs appealed.

*Errors assigned* were (1–5) above instructions, quoting them; (6) that the charge to the jury, as a whole, failed to adequately and impartially state the plaintiffs' view of the inferences deducible from the evidence; and that the charge, as a whole, had a tendency to mislead the jury.

*Ellis L. Orvis* and *John Blanchard, Calvin M. Bower* with them, for appellants.—If the court attempts to review the evidence, it is bound to do so impartially and adequately: Young v. Merkel, 163 Pa. 513; Reber v. Herring, 115 Pa. 599; Shaver v. McCarthy, 110 Pa. 339; Garrett v. Gonter, 42 Pa. 143.

Where a charge misleads the jury by inducing them to believe there is but one point of defense when there are two, and the part omitted, the most uncertain, the cause will be remanded on writ of error: Relf v. Rapp, 3 W. & S. 21.

If no particular instructions be asked, the court is responsible for the general effect only of the charge: Washington Mut. Fire Ins. Co. v. Rosenberger, 3 W. N. C. 16; Penn Iron Co. v. Diller, 17 W. N. C. 6; Penna. Land Co. v. Harris, 101 Pa. 80; Pierson v. Duncan, 162 Pa. 187; Janney v. Howard, 150 Pa. 341; Steinbrunner v. Ry. Co., 146 Pa. 504.

*John M. Dale* and *A. O. Furst,* for appellee.—This Court will not reverse where the court below submitted the case to the jury from the point of view on which the party requested, even if that was error; and further, the omission to charge upon a particular point in a civil case, where no request is made, is not ground of error: R. R. Co. v. Getz, 113 Pa. 214; Fox v. Fox, 96 Pa. 60; Penn Mut. Life Ins. Co. v. Snyder, 3 W. N. C. 269; Ritter v. Sieger, 105 Pa. 400.

Instructions of the court should be taken as a whole: Reese v. Reese, 90 Pa. 89; Carothers v. Dunning, 3 S. & R. 373; P. R. R. v. Zebe, 33 Pa. 318.

Specific instructions upon the facts must be asked for: Burns v. Sutherland, 7 Pa. 103; Bain v. Down, 54 Pa. 124; Du-Souchet v. Dutcher, 113 Ind. 249; Moore v. Brown, (Ga.) 6 S. E. 833.

OPINION BY MR. CHIEF JUSTICE STERRETT, May 11, 1896:

This case depended on questions of fact which were submitted to the jury by the learned trial judge with instructions which appear to be adequate and substantially correct. After saying to them, in substance, that, if there was no other evidence than that furnished by the introduction of the note in suit, the plaintiffs would be entitled to their verdict, etc., he called attention to the testimony relating to the notes of 1890

for $3,500 and $2,700, respectively, the renewals and subsequent consolidation thereof in one note for $6,200, the renewal of the latter for thirty days from October 1, 1891, and again for one month by the note in suit, November 6, 1891, on all of which notes the defendant, Gephart, was indorser for the accommodation of the Bellefonte Iron & Nail Company. He then referred, at some length, to the testimony of witnesses on both sides, as to the purpose for which said notes—including the note in suit—were given, the conflicting character of the testimony on that subject, etc., and then proceeded to instruct the jury, inter alia, as follows :

"Looking over all the testimony, gentlemen, and not simply that to which I have called your attention, (if there are other points in the testimony that I have not referred to, for I do not mean to withdraw any of them from your consideration,) what is the truth here ? How is the case determined in your minds ? If this note, or those of which it is the renewal, was held as collateral merely by the bank, collateral to the drafts mentioned by Mr. Munson, and those drafts have been paid, of which there seems to be little doubt, the bank could not divert the note to any other purpose and place it to the general account of the Iron & Nail Company. If there was an understanding between Mr. Munson and the officers of the bank with regard to these notes, and the note which is the final renewal of them all, such as I have explained, the bank could not violate that understanding. They could not change the condition on which they held it, and the indorser, Mr. Gephart, would have a right to enforce that condition."

"The Iron & Nail Company would have a right to enforce that condition, and, because of that right in the Iron & Nail Company, Mr. Gephart would have the same. But if, according to the testimony of Mr. Shugert, money was actually advanced upon the original notes of $3,500 and $2,700, then this note, which stands in the place of those, would be responsible for these advances, and the bank could hold the indorser upon it for the amount of these advances, which would be the consideration for the notes being given. The whole disposition of the case lies according as you find that fact. Was the note collateral to drafts which have been paid ? If it was, then the note is no longer an obligation,—it has served its purpose and

the defendant is entitled to your verdict. Upon the other hand if the notes were given and the money actually advanced upon them by the bank at the time, and advanced directly in consideration of the obligation of these notes to the bank, then they could insist now, at the end of the transaction, upon the amounts which they so advanced coming back to them, through this suit, out of this note. That is the question that you have to dispose of."

These instructions—quoted at unusual length for the purpose of showing how clearly and fairly the questions involved were submitted to the jury—were not only warranted by the testimony but they are substantially correct; and, so far, at least, as the position assumed by the plaintiffs in their second request for instructions is concerned, they are in full accord therewith. In affirming that request the learned judge instructed the jury, in the language thereof, thus :

" If the jury find from the evidence that the original notes, of which the note in suit is a renewal, were given for advances made by the bank at the time, and the Bellefonte Iron & Nail Company left the note as security for the account so further overdrawn at the time, and the note was renewed from time to time for said advances, then the plaintiffs' had the right to apply the note to the said account of the Bellefonte Iron & Nail Company, and the verdict must be for the plaintiffs."

As requested in plaintiffs' fifth point, the court also instructed the jury, in the words thereof: " That the defense set up in this case is tantamount to payment, and the burden of showing payment is upon the defendant."

In view of the instructions under which the case, as we have seen, was submitted to the jury, the only inference that can be legitimately drawn from their verdict is that they found the facts substantially as claimed by the defendant, and not as assumed by the plaintiffs in their second point, above quoted.

It follows from what has been said that neither of the first five specifications complaining of the excerpts from the learned judge's charge therein recited, respectively, should be sustained. Considered as a whole and in the light of the testimony, the charge is adequate and substantially correct. The subject of complaint in the last specification is that the charge, " as a whole, failed to adequately and impartially state the plaintiffs' view of

the inferences deducible from the evidence," and that it "had a tendency to mislead the jury." As to the latter ground of complaint, we have failed to discover anything in the charge that is calculated to mislead the jury, or to afford any adequate ground for such complaint. As to the first objection, it was the right of the plaintiffs to embody their " view of the inferences deducible from the evidence " in a request for instructions and submit the same to the court. That was not done, and the plaintiffs are therefore in no position to complain of the learned judge for not doing that which he was not even requested to do. Their position, as stated in their second request, was affirmed without any qualification, but the jury were unable to find the facts of which it is predicated. If the plaintiffs had any other position on which they intended to rely it should have been presented in connection with their other requests for charge.

There is nothing in any of the specifications of error that requires further discussion.

Judgment affirmed.